Next case will be 071188 Atlanta Attachment Company v. Leggett & Platt, Incorporated May it please the Court, The District Court made several errors below, but at least two are dispositive in this case. One is the on-sale offer of 50 production 1335 machines by Atlanta Attachment before the critical date, and the second is the lack of anything on the accused device to form a gusset. Before we get into that, just for purposes of knowing what we can ask and what we can't ask, you've got a lot of confidential material blocked in your brief in this case. Some of what seems to overlap material that's not blocked. What's the deal? The materials that were marked confidential were marked confidential by the appellee. The details that I intend to discuss are all details that were disclosed in the District Court's decision. Our view is that everything can be asked and that nothing should be confidential. The appellee obviously may have a different view. I want to agree with Judge Prost's suggestion. It seems to me that the material that's marked in these briefs as confidential is completely improper. I don't disagree, Your Honor. We did not designate it confidential. That was the confidential designation of the appellee. I think you have some obligation when the case is on appeal to work it out so that you file non-confidential briefs so that the public can understand them and we don't have to worry about disclosing confidential business information. There's material in here which is testimony in the trial which is marked as confidential. Well, there's no testimony from the trial because the trial did not occur. Or affidavits. Yes, Your Honor, that's correct. And our view was that everything should have been open. It was the appellee's position that the material that was designated confidential during the pretrial matter should remain confidential in the appeal. Our view was everything should be open to discussion by the court and everything should have been publicly disclosed. For the on-sale issue, the critical date is March 5th of 2001. And the court need only look to two pages in the appendix and one video, in our view, to understand that Claim 32 was clearly on sale and invalid. Page 3521 from the appendix is a September 2001 quotation by Atlanta Attachment offering to sell to Seeley a prototype 1335 machine. That same day on page 3522 of the appendix, Atlanta Attachment submitted a quotation offering to sell to Seeley 50 production 1335 machines for $2.5 million. Is this the third prototype we're talking about now? The offer from page 3521 is what was then built as the third prototype. That's the same machine that's offered for 50 production units. And the testimony is clear that Seeley could have accepted that offer simply by signing in the box that says, If this quotation is accepted, please sign below and return. The video that's relevant in this case is Supplemental Video Appendix 9. That video was made in February of 2001. It shows the third prototype that was made pursuant to the offer of September 2000. It shows that machine operating for over one half hour, forming a gusset, attaching a gusset to a panel at high speed on the straightaway, pleading the coroners, returning to high speed on the straightaway, over and over panel after panel. So the district court went astray because of what? I mean, the district court, there's not much here that I could find. The district court went astray because she concluded that the device had not been reduced to practice because of the high speed limitation. That was wrong for a couple of reasons. The first is Atlanta Attachment, in responding to Leggett and Platt's motion for summary judgment, admitted that every element of claim 32 was present in the third prototype, with the exception of the pleat generator element. High speed was part of the system controller claim element, which Atlanta Attachment admitted was present in the third prototype. Secondly, the district court erred because the machine that was in the videotape in February, that was in the third prototype, operated at high speed. The only disclosure in the patent that relates to high speed is actually in the claim. You have to go back to the provisional application, which included a manual from the commercial version of Atlanta Attachment's machine called the 1335. That manual says that high speed is anything from 135 RPM up to 3,500 RPM, and that's at appendix page A1289. Okay, what's the evidence in this record as to the speed of the third prototype? The speed can be seen, Your Honor, from the videotape where you can see on the straightaway it's clearly operating at above 135 RPM. How do we know that? I think that's visually apparent, but also you can tell because the selling head that was used on that machine is the same selling head that's used in the commercial embodiment. You can see on the third prototype, the sales order page A3538, it is the Yamamoto selling head that had a speed of 3,500 RPM. But the dispute is what the district court really honed in on, not just the high speed. I thought she was saying that in the fourth prototype there was a problem, and that was it was vibrating at high speed. So it's not that it couldn't work at high speed, it's that it worked with some sort of vibration that made it impractical or undesirable. Well, there's no evidence that the vibration that occurred was causing any problems because the vibration was occurring during the straightaway high speed when the pleating mechanism is not forming pleats. It's simply along for the ride. The prior art that Atlanta Attachment started from, its own model 1325 Ruffler, operated at up to 4,500 RPM and used the same type of mechanical coupling that they complain about. So that machine, which operated at 4,000... What you're saying is there was no testimony that the vibration was a problem? The only testimony was one statement by Preston Dasher, who was the chief engineer of Atlanta Attachment, that at high speed there was some vibration experience with the mechanical coupling. But not that it prevented the device from working. That's correct, Your Honor, and I think it's completely clear that everyone agreed that both the second prototype, which was actually delivered to Seeley in the summer of 2000, and the third prototype, satisfied all the limitations and clearly operated. Well, that's the question, because in the red brief they say that two of the limitations were not present in the third prototype. I think it's beginning at page 25 of the red brief. They say high speed was missing in desired location. Well, desired location simply means putting the pleats in the corner. You can see that the third prototype and the second prototype both do that in the videotapes. Also, Alvin Price, who is the chief executive officer and president of Atlanta Attachment, testified about the second prototype... Well, how do we know what desired location means in this patent? Because the only disclosure that the patent makes in terms of desired location is that you want to form pleats in the corner of the gusset to allow you to go around the corner. That's the only thing about desired location. They want to talk about being able to separate the pleating mechanism from the sewing head so that you could do multiple stitches per pleat. There is not one word in the 603 patent about independence. There's not one word about doing multiple stitches for each pleat. In fact, the only disclosure is a one pleat per one stitch where when the needle goes down, the pleating mechanism goes back. When the needle goes up, the pleating mechanism goes down. So this talk of independence is simply irrelevant. In fact, the district court rejected their attempt to read into the pleat generator claim element the limitation that the pleating mechanism be independent from the sewing head. Atlanta Attachment hasn't challenged that construction by the district court. So independence by the pleating mechanism is simply irrelevant. It's clear that what the parties all desired was to be able to form pleats in the corner. The evidence in the record shows that Sealy came to Atlanta Attachment saying, we've handmade this panel with a gusset where we hand form the pleats in the corner. We want you to automate that process. So the desire was to form pleats in the corner, not in the straightaway section. And that's what both the second prototype and the third prototype did. If you were to prevail on the issue of the sale bar, does that get rid of the inequitable conduct as well, or is that still alive? It does not get rid of the inequitable conduct. Obviously, the question for inequitable conduct extends to the entirety of the patent. If there was inequitable conduct for any claim, that renders the entire patent unenforceable. The only issue on sale bar before the district court was claim 32. It eliminates it in that if there is an invalid claim 32, there's no longer a claim of infringement against leg and a pleat, but the inequitable conduct claim is still there. But your suggestion in the inequitable conduct is that where the district court went astray is very much related to the on sale bar issue. It is in terms of one of the information that Atlanta Attachment failed to disclose was the on sale bar. Under the Manville decision, we believe that it's clear that regardless of whether something's experimental, an on sale bar has to be disclosed to the patent office. But there's also other prior art that they didn't disclose. Their own model 1325 prior art ruffler, which was the very starting point from which they developed the 1335, which is a commercial embodiment, they did not disclose to the patent office. They also did not disclose a patent that was owned by Sealy, but was included in an application that disclosed this very machine. They did not tell the patent office about that. So there's additional material that was not disclosed besides the on sale bar for the inequitable conduct claim, Your Honor. Turning to the infringement issue. The inequitable conduct is an optional for this court. It's optional to reach it, isn't it? This is not a cardinal chemical kind of case where we have to reach in validity even though there's no infringement. Well, I believe that you would because the district court made rulings on both issues. If you, for example, reversed on the infringement consideration, I think you still have to address the validity issues. You can't. I'm talking about enforceability. I'm sorry? Inequitable conduct goes to enforceability. But if you prevail on the on sale bar, then there's no infringement. That's correct, Your Honor. There would be no infringement. And so there's no dispute between the two of you anymore. Well, that's not true because there is still the issue of whether the other claims may be asserted now or in the future. There is certainly a dispute between the parties. And we believe that under the Supreme Court's recent decision that says that as long as you don't need to have an action, there has to be a claim of infringement in order for there to be an actual dispute between the parties. But we would agree if there's a finding that the patent is invalid or that there's no infringement. Certainly, the unenforceability claim has little value to Ledgett and Platt at that point. And you would agree if the invalidity is reversed, then there's no need to reach the infringement issues? I would agree that if there's a finding of invalidity, there is no need to reach the non-infringement issue. Have they ever asserted that you're infringing any of the claims other than 32? They have asserted post this decision that a subsequent machine that was developed by Ledgett and Platt may raise issues relating to this patent. And they didn't point to any specific claims. But that's it? That's separate and apart from this. No, but I mean that's the extent of any assertion that they've made about infringing other claims. That's correct, Your Honor. I would like to briefly address the infringement issue, which is the gusset forming station limitation. That limitation expressly requires that the accused device automatically form the gusset. A gusset is a V-shaped strip of material that attaches the top of a pillow-top mattress to the base. And in the 603 patent, what the specification equates to forming it is to fold it. But clearly, to form the gusset, you have to alter the shape. You have to mold it, shape it, or form it. The accused device, and this can be seen in the Supplemental Video Appendix 9. I mean, I'm sorry, the Prototype No. 3, which shows how they do it. Atlanta Attachment. The material comes off of a reel. It goes through the folder that folds the gusset material to form it. And then that's sewn to the panel along the fold line, giving you the gusset. On the accused device, which can be seen on Supplemental Video Appendix 10, which was a videotape made by Atlanta Attachment during an inspection, you can see the material comes off of a reel, goes through a guide that all it does is align the material, and the material is then sewn to the panel. The gusset material is not formed into a gusset because it's never altered. There is no shaping or forming or folding of any kind. Any gusset that might be made would be downstream in a subsequent operation to make a mattress. But the accused device does not in any way alter the shape of the gusset material. The district court's claim construction read out of that limitation, the automatically forming limitation, by simply saying you have to align the material. I can align this material with the podium, but I haven't done anything to it. I need to alter its shape in some way. It's undisputed that the accused device does not in any way alter the material that comes off the reel in order to form a gusset. I'll reserve the remaining time for rebuttal. Thank you. All right, thank you. Mr. Sawyers. Many pleas to the Court, Your Honors. Given the two points raised on the appellant's side, I'll limit my remarks to that unless the Court has other comments. Well, could you start by addressing the confidentiality? Yes, Your Honor. That issue was raised with us the night before the brief was due. This was not something that we had a heads-up about. We would have probably removed the confidentiality stance, but we weren't given the opportunity to do that because we were just asked literally the night before the brief was due. So, Your Honor, I believe that what is in the record is old stuff and probably would have been removed as confidential, but we just weren't given the opportunity to react in time. I had to talk to my client, and there wasn't time in the few hours before the brief was due. It could be done now, I suppose. It certainly could, Your Honor, and we would certainly be amenable to that. So I apologize if that's caused the Court inconvenience. Well, it's not just the Court. It's also the public. I mean, it's supposed to be a public proceeding. People are supposed to have briefs that they can read, and what happens in a lot of these cases is people mark things as confidential, which aren't conceivably confidential, and the public can't tell what's going on. Yes, Your Honor. Well, there's certainly a tendency for lawyers to overmark stuff confidential. I've been there. I understand. But in this case, again, I apologize. We can correct that if Your Honor's desire. I think this case does boil down on the on-sale issue to understanding what FAF does. FAF sets out two things that the Court is to look at. Before you get to that, let me see if I can understand where we are. If I understand correctly, you agree that the third prototype embodied all the claim limitations except for the two that you begin to discuss on page 25 of the red brief. Is that correct? That is correct, Your Honor. Okay. So the question is whether those two differences between the third prototype and the patent really exist. And what is your understanding, to take the second one first, as to the meaning of desired location? Yes, Your Honor. The court and we are both, the district court and we are both in agreement that the difference between the third and the fourth was the ability to place the pleats at desired locations, which means that there was independent control over that pleat generator, which only happened at the fourth embodiment when the decoupling occurred between the pleat and the sewing process. How do we tease that out of the specification or the claim language? Your Honor, I don't know that it's necessarily a claim language issue as much as it is an intended purpose issue. And that's the point I was going to get to on FAF. I think what FAF tells the court is that when you're looking at devices that are under an experimental use exception, which is what we are talking about here, the question is what is the intended purpose of the device and what testing is needed to make sure that that device operates for its intended purpose. And there was testimony from our witnesses that said the third didn't work for its intended purpose because it couldn't put pleats where we wanted to because it was one pleat, one stitch. So are you agreeing then that desired location in the claim just means in the corner? Yes, Your Honor. It would mean that would be a desired location and that is taught in the patent, yes. Okay, so what about the other one, the high speed? High speed sewing was something that was also desired, as the patent says, such that you can slow down the machine and pleat at a different speed at the corners than you do on the straightaway. So is it a relative thing? I mean is the significance of saying high speed, it says to enable high speed and sewing at a different rate. Is it just a relative thing? It's a relative thing. I mean to people skilled in the art they would understand that when you're going down a straightaway just sewing you can go fast. Faster. Faster, yes, and when you get to the corner you need to slow down because you're doing a more complicated process. So did not the third prototype go faster and then slower? It did go faster and slower, but here's the difference. It didn't meet its intended purpose because it couldn't work in the operational world that it was being designed for. How do we, where do we look in the patent to say that a limitation is absent, that it's not working? You look in the factual record when you're assessing under. Because it vibrated, so is your point because it was vibrating so it was not operational? Operational, yes. So what you're saying is that it did satisfy the high speed claim limitation, but that it didn't work for its intended purpose. Intended purpose, correct. That's what we're saying. And there's case law that talks about that. I mean we've cited it to the court, but that is where you get to when you get to the experimental use land. You're looking to will it work and it's an intended purpose. And this case matches up with a lot of this court's precedent on that. Because yes, it could go fast, but it made a lot of noise. It wasn't something that the customer was interested in. So we kept testing and we actually ended up coming up with a better mousetrap. We came up with this decoupling concept that was then present in the fourth embodiment. And it was only at that point that the intended purpose part was met. So as the court analyzed this, and she spent a lot of time, she had two lengthy orders looking at all the record evidence on this. In the second order, she came to the realization that really what we have under FAF is there was not a commercial offer for sale here because it was primarily for experimentation. And when you look at the underlying facts, all those facts jump out at you as you've seen in other cases. You really have a control of the process by Atlanta Attachments. You have the return of the machines. You have a lot of things going on that match up with the facts of these other cases. But I'm a little unclear on, you say, the vibration and the noise. Did that make it inoperable? Did that mean that it didn't meet? What in the claims, what in the patent did it not meet because it was vibrating or had some vibration or some noise? Your Honor, it did not meet its intended purpose. I think that has to be my answer to that question. Its intended purpose is stated in the patent. Yeah, in the claims it's stated to be able to sew at high speeds and then to be able to place pleats in desired locations. And does the fact that it vibrates and makes noise preclude it from doing those things? It did in the factory floor context in which the machine was being designed. I don't understand what that means. I thought that the video showed that it was working and that there was testimony by your own witnesses that it worked. Your Honor, what the video and what the testimony showed was that it wasn't able to perform to the satisfaction of the designer or ultimately the customer that they were talking to on this. But it worked. It did work, yes. And what court said? But it didn't work for its intended purpose. Well, what case says that? I mean, where does the patent say, and we want all customers to be happy and satisfied? Why is that tied to— Your Honor, well, I'll go—I mean, the FAF case starts down this process. It recognizes that there's two things you have to show, that there's a—for reduction of practice. It meets every limitation of the claim, which I think is Your Honor's question. Does it go fast? Yes, it meets that element. You agree that it meets the claim limit. It meets the claim limitation. But the other aspect of reduced reduction of practice in FAF, and in all the cases post-FAF, is it has to also operate for its intended purpose. And it's at that point that the judge, the district court in this case, looked to the claim language and said its intended purpose here is to be able to go at high speeds and to have desired fleet location. Those features were still under experimentation. It was still being tested. They were still going back and forth to make sure that they could get a device to meet those intended purposes so that the language— I mean, when you look at the case law, for instance, the EASY Dock case, the EASY Dock, it's just a dock. It was working for its intended purpose. You could put pieces together, and you had a dock. So there's no question that the claim language in EASY Dock was met by the device. Nevertheless, this court said there could still be testing going on because you needed to put it in the water to see if the device would work and hold up under— Well, this one was put in the water. Pardon? This one was put in the water. It was put on the factory floor, and it worked, right? Yes, it was, but it didn't start working until months after the bar day. I mean, that's what the issue was. What do you mean it didn't start working? It didn't work for its intended purpose. They couldn't figure that out until they put it on the factory floor. So they had it on the factory floor. They were actually operating the machine to attach the gussets, right? That's correct. Right? That's correct. So what's the problem? Well, let me—it's no different than EASY Dock, Your Honor, because in EASY Dock, the pieces were put together. If you read the claim language in EASY Dock and you look at the device, just like in our case, when you look at the device and look at the claim language, you're going to say they match up. But there's another analysis that you have to go to. And that other analysis is, well, will the dock work in its intended purpose? And even though it was delivered to a customer before the bar day in EASY Dock, you could still make the experimental use argument because there was still intended purpose experimentation. Well, it sounds to me as though what you're saying is you can go out and sell something and offer to sell it, and you don't have to worry about the on-sale bar as long as you continue to improve the device in relation to one of the claim limitations. Your Honor, what the courts look to now—and again, the Allen Engineering, EASY Dock, inside all these cases—what they do look to is what's the underlying sales look like? Is it a commercial sale or is it an experimental use sale? And this—the district court looked at the facts here and said this fits—it's much more on the experimental use side. Yeah, but there was an offer to sell a quantity of these things. I mean, even if you assume that the individual sale here was just for research purposes, there was an actual offer to sell a specific quantity of the prototype, right? There were offers to sell in the paperwork that's in the record. Yes, Your Honor. And in our case, in a recent—I think one of our more recent cases, Honeywell, they talk about reduction intended purpose, and they talk about a demonstration of the workability or utility of the claimed invention. You'd agree, right, that it satisfies that? No, I don't agree. The workability and the utility are not satisfied? No, I do not. Why? Because it was vibrating? Pardon? Because it was vibrating? Because it was vibrating. But how do we know that the intended purpose is to have a machine that doesn't vibrate? Where do we learn that from looking at the claims or the spec? The analysis is to be performed, I believe, from the person having skill in the art looking at this situation. And we did have testimony from our witnesses that said this device didn't work for its intended purpose. Its intended purpose is to make pleats in a high-speed manner and put them where you want it. But the problem is that we've said that if improvements in the device don't relate to a claim limitation, that can't be an experimental use. I mean, what Judge Proust is pointing out is there isn't any vibration claim limitation. So trying to experiment to get rid of the vibration doesn't relate to a claim limitation. It did, Your Honor, in this sense. Again, the high-speed feature is what was under development. So what was being tested under the environments that are present in the third and the fourth prototype. So that they were intending to fix a problem that they had. And there was plenty of testimony that there was a problem, that the device didn't work for its intended purpose. I feel like I'm repeating myself because I am. But that's the way that I think the law plays out, is that the intended purpose issue is what this case hinges on. And I think that the intended purpose, as the witnesses and the experts, certainly from our side, testified, that the third device didn't work for its intended purpose to someone who was skilled in the art looking at this. And that it was only the fourth device that obtained that. Let me turn to another issue before the time runs out. Is it your view of the law, then, that if we were to reverse on the validity issue, on the on-sale bar issue, we would still have to at least remand on the inequitable conduct or that that would be finished? Would we have to reach inequitable conduct? I don't know the answer to that question, Your Honor, to be honest. I mean, I think the law is somewhat in flux in that. But we obviously don't want you to go there. But I think that this decision that the court made on the commercial offer for sale, really the other thing I think that Your Honors would have to wrestle with is the second prong as well, which is the district court found both prongs were not present here. She found, one, that there was not a commercial offer because when you put all this record evidence in the pile, it looked a lot more like experimentation to her than a commercial offer. And I think that, to Your Honor's question about the quotes, the written quotes, I think that those written quotes are no different than what is present in some other cases. I think that there were, in the Monin case, for instance, there was a trailer that was sold to a company, a trucking company, to run for a year. And there was a quote, we'll sell you 400 of these if you like this one. So that has not barred this court from affirming that there are on sale, I'm sorry, that experimental use can still apply even though there is some prospect of a commercial aspect of the invention being used after it's tested thoroughly. And that's what this case is. It lines up with the precedent in this court such that I would suggest that reversing would require reversing some of that precedent, at least on the facts in front of the court. On the gusset forming station in the few moments I have left, I think that is a claim construction argument that just doesn't hold water. I think when you look at the way the claim language plays out throughout the patent, the inventor was very clear and knew how to use folder when he wanted to use the word folder. And he used gusset forming station in a different way. And as the court found, if you look at the dependent claim, I think it's 36, you see the gusset folder is included in a gusset forming station, but it's not the only thing that's in a gusset forming station. Claim 36 indicates that gusset forming station can include an accumulator, a gusset folder, and a sewing machine. So by claim differentiation, you would come back to say, well, there can be less than all three of those in a gusset forming station. So I see that my time is up, unless there's any further questions. Thank you. Thank you. That might please the court. Atlanta Attachments president and CEO admitted that the second prototype that was delivered to Seeley in the summer of 2000 worked for its intended purpose. Question, was there any difficulty in an operator operating the machine in order to manufacture a gusseted, ruffled pillow top mattress top using the second prototype? Answer, the machine was perfectly capable of doing that. It was just not a machine that you would put into production and expect the most efficient use of the person's time. That's page 3372 of the appendix. So all that was happening after the second prototype, which you can see in operation in supplemental video appendix 8, was that Atlanta Attachment was trying to improve to make a commercial version, but that is not what the law requires for reduction to practice. As long as it works for the intended purpose, and it's clear from the patent that the intended purpose here is to attach a gusset to a panel and pleat the corners. The second prototype did that. The third prototype did that. And once you've reduced a device to practice, there can be no experimental use exception. This court said that in its Allen Engineering decision. It said that recently in the Cargill decision. This case is very different from Monon and from Honeywell. As he said in Monon, they said, If you like this, we'll sell you this many. And in Honeywell, they said, If and only if the tests are successful, will we sell these to you. Here, Atlanta Attachment made a plain offer for 50 machines, no strings attached. If they signed it, they would have sold them.  I request that the court reverse the district court's rulings, remand with instructions that the claim 32 be held invalid and not infringed. Thank you. Thank you. Case is submitted. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m.